UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CURTIS CUMMINGS,<br><br>Defendant. | 5:23-CR-50096-JLV-03<br><br><br>REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE (DOC. 38) |

Curtis Cummings filed a Motion to Suppress Evidence (Doc. 38) and memorandum in support of his motion to suppress evidence (Doc. 40). Cummings requested an evidentiary hearing be held. (Doc. 40, p. 3). The United States filed a response in opposition to the motion. (Doc. 45).

An evidentiary hearing was held on November 7, 2023. Cummings was personally present and represented by his attorney of record, Conor Duffy. The United States was represented by the Assistant United States Attorney, Gina Nelson.

Based on a careful consideration of all the evidence and counsel's arguments, the Court respectfully recommends that Cummings' Motion to Suppress (Docs. 38) be denied.[1]

---

[1] No transcript was prepared. Rather, all citations to the testimony presented at the evidentiary hearing are to For The Record ("FTR") audio recording, Rapid City Courtroom 3, Tuesday, November 7, 2023, beginning at 10:00 a.m.

## JURISDICTION

Cummings is charged in an Indictment with Distribution of a Controlled Substance Resulting in Death in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)).  (Doc. 1).  The pending motions were referred to the Magistrate Judge pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) and United States District Court District of South Dakota's local rules, LR 57.11(B).

## FACTUAL BACKGROUND

On November 28, 2022, Alan Landeros, Deputy with the Larimer County Sheriff's Office, was on patrol.  FTR 10:05 a.m.  Deputy Landeros testified that he parked at an O-Reilly's Auto Parts store in Wellington, Colorado.  Id.  Wellington is a small town, located right off Interstate 25, and is the last place to obtain gas or food before leaving Colorado and entering Wyoming.  Id. at 10:07 a.m.  Deputy Landeros testified that due to Wellington's location, drug transactions frequently occur there.  Id.

Deputy Landeros testified that he frequently chooses to park at the O-Reilly's Auto Parts because it is located directly off on Interstate 25 and gives him a 360 view of every car that is entering and leaving Wellington from the Interstate and a vantage point to conduct surveillance on three gas stations.  Id. at 10:06 a.m.

At approximately midnight, he "observed an older Chevy Suburban with South Dakota plates and [] a Subaru Sudan with Colorado license plates."  Id.

2

at 10:08 a.m.  He testified that he conducted a license plate check and learned that the registered owner of the Subaru was a male on probation for possession of illegal narcotics.  Id.  Deputy Landeros stated it was clear that the vehicles were together because the male, later identified as Cummings, was going back and forth between the vehicles, cleaned the windshields of both vehicles, and took a dog and dog bed from the Subaru to the Suburban.  Id. at 10:09 a.m. Deputy Landeros saw the driver of the Subaru, later identified to be Katey McGruder,[2] exit the gas station, without carrying any merchandise.  Id.

Deputy Landeros testified that his suspicions were heightened due to the totality of the circumstances, namely the car's location in a high crime area, time of day, and fact that no other cars were around.  Id. at 10:10 a.m.  Deputy Landeros was also suspicious that the Subaru's registered owner was not the driver, which he observed as the driver was a female and not a male.  Id. Additionally, he was suspicious because the registered owner had a criminal history of possession of illegal narcotics, which raised concern as people in the drug industry often share vehicles.  Id.

A man, identified to be Cummings, entered the Suburban, left the parking lot, and headed southbound.  Id. at 10:12 a.m.  The Subaru did not follow the Suburban; Deputy Landeros "thought that was weird because it was very evident that they were together."  Id.  Deputy Landeros testified that he felt that the "Suburban was trying to bait [him] away from the Subaru."  Id. Approximately two to three minutes later, the Subaru left the parking lot and

---

[2] McGruder is a codefendant in Cummings' case.

3

headed southbound.  Id.  Deputy Landeros drove behind the Subaru and followed it without activating his lights or siren.  Id. at 10:13 a.m.  Deputy Landeros observed the Subaru make a quick and abrupt left-hand turn into the first opportunity that it had, which was a parking lot of a closed McDonalds.  Id.

Deputy Landeros lost visual of where the Suburban went once it drove southbound because he was focused on the Subaru.  Id. at 10:14 a.m.  To conduct further surveillance of the Subaru, Deputy Landeros drove around the corner to a stop where he was hidden.  Id.  Deputy Landeros saw the Suburban parked right next to the Subaru; so, the two vehicles were parked right next to each other in "probably the most dark and hidden corner of that parking lot." Id. at 10:14-15 a.m.  Deputy Landeros used binoculars and saw Cummings transport items between the vehicles.  Id. at 10:15 a.m.  Deputy Landeros observed that Cummings took his jacket off, so he was just wearing a t-shirt; Deputy Landeros "thought was very odd because it was very cold outside."  Id. Deputy Landeros testified that Cummings "100 percent [] knew that [he] was watching him because he kept looking back at [him]."  Id. at 10:16 a.m.

Deputy Landeros testified that Cummings behavior was concerning, namely Cummings' display of excessive paranoia.  Id.  Deputy Landeros testified that the fact that McDonald's was "obviously closed" and where the vehicles "were parked heighted [his] suspicion that they were essentially trying to hide from" him.  Id.

The vehicles remained in the McDonald's parking lot for approximately

4

five minutes.  Id. at 10:17 a.m.  The Suburban backed out of the parking spot and drove around the McDonald's.  Id.  The Subaru drove completely around the closed drive though.  Id.  Deputy Landeros began to follow the Suburban. Id.  As soon as Deputy Landeros was behind the Suburban, it made a "quick and abrupt" right-hand turn into the gas station parking lot.  Id. at 10:17-10:19 a.m.  Deputy Landeros resumed his position at the O-Reilly's Auto Parts store.  Id. at 10:18 a.m.  The Subaru drove into the gas station parking lot and parked next to the Suburban.  Id. at 10:20 a.m.  The occupants did not exit their vehicles.  Id.  Approximately two to three minutes later, the Suburban left the parking lot.  Id. at 10:21 a.m.

At that point, Deputy Landeros drove behind the Suburban and the Subaru started following Deputy Landeros.  Id. at 10:21 a.m.  Deputy Landeros saw the Suburban make a wide turn, driving outside of his lane of traffic, and drive onto Interstate 25 onramp headed northbound.  Id. at 10:21 & 10:47 a.m. At that point Deputy Landeros conducted a traffic stop.[3]  Id. at 10:22 a.m.

When Deputy Landeros turned on his emergency lights, the Suburban immediately braked and "almost jerk[ed] to the right off of the roadway."  Id. at 10:25 a.m.  The Suburban did not completely stop but continued to "slow roll." Id.  Deputy Landeros was concerned the Suburban might flee.  Id.

When Deputy Landeros approached the Suburban, Cummings was holding his ID, almost completely outside of the window.  Id. at 10:26 a.m.;

---

[3] Deputy Landeros testified that he conducted the traffic stop based on reasonable suspicion of drug activity.  Id. at 10:22 a.m.

Exhibit 2.[4]  FTR 10:26 a.m.  Deputy Landeros explained to Cummings the suspicious nature of his behavior.  Id.  Cummings explained that he and McGruder, his fiancé, traveled to Longmont, Colorado to purchase the Subaru from a friend.  Id.  Cummings said he gave cash to McGruder for food at McDonalds before they realized it was closed.  Id. at 10:27 a.m.  Deputy Landeros did not believe Cummings' story because he did not see Cummings give McGruder any money nor any attempt to get food.  Id.

While the stop was occurring, the Subaru drove past Deputy Landeros and "slowly stop[ped] aways in front of the Suburban." Id. at 10:22 a.m. Cummings repeatedly requested that Deputy Landeros talk to McGruder for information.  Id. at 10:28 a.m.  Deputy Landeros believed Cummings was trying to divert his attention towards the Subaru and away from the Suburban. Id.  Eventually McGruder drove off and left.  Id. at 10:29 a.m.  After the search was completed, the Subaru returned.  Id. at 10:34 a.m.

Deputy Landeros checked Cummings driver's license and it was "clear and valid."  Id. at 10:30 a.m.  Deputy Landeros went back to Cummings to confirm his story.  Id.  Deputy Landeros testified that Cummings still appeared to be quite nervous and was repeating what appeared to be a rehearsed story. Id. at 10:32 a.m.  Cummings now changed his story and stated that it was his friend's truck, and he was borrowing it.  Id.  Deputy Landeros asked for documentation to verify who his friend is.  Id.  Cummings provided proof of car insurance to Deputy Landeros.  Id. at 10:31 a.m.

_____

[4] Exhibit 2 is the video from Deputy Landeros' body warn camera.

While Deputy Landeros was looking at Cummings' car insurance, Corporal Kaley arrived. Id. at 10:32 a.m. Prior to Deputy Landeros observing the traffic violation, Deputy Landeros contacted Corporal Kaley, deputy with the Larimer County Colorado Sherrif's Office, to inform him that he was watching a vehicle and requested that Corporal Kaley start heading north in case he was able to stop the vehicle. Id. at 10:24 a.m.

Corporal Kaley was working the midnight shift with his dog "Lukin." Id. at 10:57 a.m. Corporal Kaley has been a K-9 handler for approximately five years. Id. at 10:53 a.m. Corporal Kaley testified as to his own and Lukin's training and experience. Id. at 10:53-54 a.m. Corporal Kaley testified that Lukin alerts by snapping his head back, closed mouth sniffing, and if he is close to the substance, he becomes aggressive and bites, barks, and scratches. Id. at 10:56 a.m.

At approximately 1:11 a.m., Lukin began his sniff for narcotics. Id. at 11:00 a.m. Corporal Kaley walked Lukin to the Suburban's driver's side headlight. Id. Corporal Kaley gave Lukin the command to search, which for them was "find dope." Id. Corporal Kaley testified that Lukin alerted to the presence of narcotics by snapping his head back and breathing with his mouth closed. Id. at 11:01 & 11:11 a.m. Then, Lukin walked by the rear driver's side door, bit the handle, and pulled the door open. Id. Corporal Kaley testified that Lukin followed all protocol while conducting the sniff. Id.

At that point, based on Lukin's alert, Deputy Landeros conducted a search of the Suburban. Id. at 10:34 a.m. During the vehicle search,

7

Cummings was holding his small dog by Deputy Landeros' patrol vehicle.  Id. at 11:08 a.m.  During the search, Cummings asked, "don't I have to give him permission to do that." (Exhibit 2).  Corporal Kaley explained that the dog alerted to possession of illegal narcotics which provided probable cause to search the vehicle without consent.  Id.

On the driver's side Deputy Landeros found "a plastic pen tube that has burnt ends on each end and has brown residue,"  which is used "to inhale the smoke that comes from illegal narcotics." Id. at 10:35 a.m.  Underneath the front seat, Deputy Landeros found a small black box, which was held together by a magnet; within the box was a "brown substance" and "little bindle of aluminum foil." Id.  Within the bindle "was a large amount of small blue pills that had M30 imprinted on them." Id. at 10:36 a.m.  Based on Deputy Landeros training and experience, he believed those were fentanyl pills. Id. Once Deputy Landeros located the pills, he stopped the search and placed Cummings in handcuffs. Id.

## DISCUSSION

In a criminal case, a defendant may move to suppress the use of evidence at trial that he believes was obtained in violation of the Fourth Amendment, including any "fruit" derived from that evidence.  Wong Sun v. United States, 371 U.S. 471, 484–86 (1963).  Such evidence is suppressed only when the Court finds: (1) "the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct," and (2) "the exclusionary

sanction is appropriately imposed in a particular case." <u>United States v. Leon</u>, 468 U.S. 897, 906–07 (1984).

Cummings argues that the November 28, 2022, stop was performed without reasonable suspicion or probable cause in violation of his Fourth Amendment Right against unreasonable search and seizure. (Doc. 38). He further asserts that the subsequent search of the car was conducted without probable cause in violation of his Fourth Amendment right. <u>Id.</u> Cummings "moves to have this honorable court to suppress any and all evidence and statements as the fruit of either an unlawful stop or unlawful search. (Doc. 40, p. 3). The court will address each argument separately.

## I.    The Stop of the Suburban did not Violate the Fourth Amendment

Cummings "moves this Court to suppress evidence obtained as a result of a traffic stop performed by Larimer County, Colorado, Deputy Alan Landeros and search based on a K9 alert by Larimer County K9 handler Deputy Jeffrey Kaley on a vehicle that Defendant was driving on November 28, 2022. This traffic stop was performed without probable cause to believe that a crime had occurred and without reasonable suspicion to believe that criminal activity was afoot. The search was conducted without sufficient probable cause." (Doc. 38, p.1).

The Fourth Amendment protects citizens from unreasonable searches and seizures. <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). However, it is well established that "a limited investigative stop of a vehicle by law enforcement officials, without a warrant, 'is permissible under the fourth amendment in limited

9

circumstances.' " United States v. Thomas, 992 F.2d 201, 202 (8th Cir. 1993)

(citing United States v. Peoples, 925 F.2d 1082, 1086 (8th Cir. 1991)).

Pursuant to Terry v. Ohio, officers may briefly detain and ask questions

of people whom they reasonably suspect of criminal activity. Terry, 392 U.S. at

20-23. "This rationale extends to stops of automobiles, when the police have a

reasonable suspicion that the occupants are violating the law." United States

v. Chhunn, 11 F.3d 107, 109-10 (8th Cir. 1993) (citing United States v.

Hensley, 469 U.S. 221, 226 (1985)). "Police officers are justified in stopping a

vehicle for investigatory reasons if they have a 'reasonable, articulable

suspicion that the person has been, is, or is about to be engaged in criminal

activity.' " Thomas, 992 F.2d 201, 203 (citing United States v. Wantland, 754

F.2d 268, 270 (8th Cir. 1995) (quoting United States v. Place, 462 U.S. 696

(1983)). The constitutional analysis under Terry is two-part: (1) "whether the

officer's action was justified at its inception," and (2) "whether it was

reasonably related in scope to the circumstances which justified the

interference in the first place." Terry, 392 U.S. at 20. Cummings does not

argue that the scope of the traffic stop was unreasonable; thus, the only issue

was whether the stop was justified at its inception.

A law enforcement officer has reasonable suspicion when the officer is

aware of particularized, objective facts which, taken together with rational

inferences from those facts, reasonably warrant suspicion that a crime is being

committed. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994);

Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (describing reasonable suspicion

as "a minimal level of objective justification"). In considering whether reasonable suspicion exists, the court must consider "the totality of [the] circumstances," and the "whole picture must be taken into account." Thomas, 992 F.2d at 203 (citing Wantland, 754 F.2d at 270) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)); United States v. Arvizu, 534 U.S. 266, 274 (2002) (rejecting a "divide-and-conquer analysis" where a court concludes each individual fact is "entitled to 'no weight' " because it is "readily susceptible to an innocent explanation"). "An officer may have reasonable suspicion to conduct a Terry stop based on a combination of factors even where no single factor, considered alone, would justify a stop." United States v. Quinn, 812 F.3d 694, 698 (8th Cir. 2016) (citing Terry, 392 U.S. at 22).

The totality of the circumstances also involves "commonsense judgments and inferences about human behavior," Wardlow, 528 U.S. at 125, as well as inferences the officer may draw based on his "experience and specialized training," Arvizu, 534 U.S. at 273. Even entirely innocent behaviors may establish reasonable suspicion in some circumstances. United States v Sokolow, 490 U.S. 1, 9-10 (1989); see Navarette, 572 U.S at 403 (noting that an officer "need not rule out the possibility of innocent conduct").

### A. Reasonable Suspicion

Applying the relevant legal principles to the facts adduced at the hearing, the United States established that Deputy Landeros had reasonable suspicion to stop the Suburban on November 28, 2022. The court finds Deputy Landeros testimony as to his observations and conclusions to be credible.

Deputy Landeros observed Cummings go back and forth between the Subaru and the Suburban. Id. at 10:09 a.m. Then he observed that the driver of the Subaru was not the vehicles registered owner and the registered owner had a criminal history of possession of illegal narcotics and was on probation. Id. at 10:10 a.m. Deputy Landeros saw the Suburban leave the gas station parking lot and the Subaru did not follow, which Deputy Landeros thought "was weird because it was very evident that they were together." Id. at 10:12 a.m. Deputy Landeros testified that he felt that the "Suburban was trying to bait [him] away from the Subaru." Id.

The Subaru left the parking lot and Deputy Landeros drove behind it without activating his lights or siren. Id. at 10:13 a.m. Deputy Landeros observed the Subaru make a quick and abrupt left-hand turn into the first opportunity that it had, which was a parking lot of a closed McDonalds. Id. In the parking lot of the McDonald's, Deputy Landeros saw the Suburban parked right next to the Subaru in "probably the most dark and hidden corner of that parking lot." Id. at 10:14-15 a.m. Deputy Landeros used binoculars and saw Cummings transport more items between the vehicles. Id. at 10:15 a.m. Deputy Landeros observed that Cummings took his jacket off, so he was just wearing a t-shirt; Deputy Landeros "thought was very odd because it was very cold outside." Id.

Deputy Landeros testified that Cummings "100 percent [] knew that [he] was watching him because he kept looking back at [him]." Id. at 10:16 a.m. Deputy Landeros testified that this display of excessive paranoia was

12

concerning.  Id.  Deputy Landeros testified that the fact that McDonald's was "obviously closed" and where the vehicles "were parked heighted [his] suspicion that they were essentially trying to hide from" him.  Id.  These events took place at approximately midnight.  Id. at 10:08 a.m.

The vehicles exited the McDonald's parking lot in separate directions.  Id. at 10:17 a.m.  Deputy Landeros began to follow the Suburban; as soon as Deputy Landeros was behind the Suburban, it made a "quick and abrupt" right-hand turn back into the gas station parking lot, the same gas station it initially came from.  Id. at 10:17-10:19 a.m.  The Subaru drove into the gas station parking lot and parked next to the Suburban.  Id. at 10:20 a.m.  The occupants did not exit their vehicles.[5]  Id.  Approximately two to three minutes later, the Suburban left the parking lot.  Id. at 10:21 a.m.

Deputy Landeros drove behind the Suburban and the Subaru started following Deputy Landeros.  Id. at 10:21 a.m.  Deputy Landeros saw the Suburban make a wide turn, drive outside of his lane of traffic, and drive onto the Interstate 25 onramp headed northbound.  Id. at 10:21 & 10:47 a.m.  Deputy Landeros testified that he conducted a traffic stop on the Suburban based on reasonable suspicion.  Id. at 10:22 a.m.

---

[5] During cross examination, the line of questioning implied that the reason the vehicles went to the McDonalds and then back to the gas station was to get something to eat.  Cummings and McGruder's actions of staying in their vehicle and not entering the convenience store undermines this theory.  Instead, it lends support to Deputy Landeros' belief that criminal activity was afoot.

Based on the totality of the circumstances, Deputy Landeros' observations amount to reasonable suspicion that the crime of distribution of a controlled substance was occurring.  Deputy Landeros made a "commonsense judgment[] and inference[] about [Cummings and McGruder's] human behavior[s]."  <u>Wardlow</u>, 528 U.S. at 125.  Even Cummings and McGruder's innocent behaviors may be considered in establishing reasonable suspicion. <u>Sokolow</u>, 490 U.S. at 9–10; <u>see</u> <u>Navarette</u>, 572 U.S at 403 (an officer "need not rule out the possibility of innocent conduct").

Deputy Landeros testified as to objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime, namely distribution of a controlled substance, was being committed.  The court agrees for the reasons summarized in the forgoing paragraphs and finds that Deputy Landeros had reasonable suspicion to stop the Suburban.

## II.    Probable Cause Existed to Search the Car

Cummings argues "[t]he dog sniff conducted by Larimer County Deputy Jeffrey Kaley in this case was insufficient, and did not provide probable cause to search the vehicle Defendant was driving."  (Doc. 40, p. 3).

Where a warrantless search occurs, the burden is on the United States to show by a preponderance of the evidence that an exception to the warrant requirement applies.  <u>United States v. Cedano-Medina</u>, 366 F.3d 682, 684 (8th Cir. 2004).

The automobile exception to the warrant requirement requires the United States to demonstrate, at the time of the search, they had probable cause to

14

believe the vehicle contains contraband or other evidence of a crime, and not merely at some earlier time.  United States v. Kennedy, 427 F.3d 1136, 1140-41 (8th Cir. 2005) (citing United States v. Formaro, 152 F.3d 768, 771 (8th Cir. 1998)).  "There is no fixed formula for determining when information has become stale."  United States v. Smith, 266 F.3d 902, 904 (8th Cir. 2001).  Rather, the timeliness of the information depends on the circumstances of the case, including the nature of the crime and the property sought in the search.  United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997).

To determine if probable cause was present, courts should consider all relevant circumstances and apply a "common sense approach."  Kennedy, 427 F.3d at 1141 (citing United States v. Gleich, 397 F.3d 608, 612 (8th Cir. 2005)); see Texas v. Brown, 460 U.S. 730, 742 (1983) (holding "probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." (internal citation omitted)).

The court need not, and indeed must not, inquire into the subjective intentions of officers in making the determination for probable cause; instead, the court reviews what information was available to officers at the time of the search from the perspective of a hypothetical reasonable officer.  Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("an arresting officer's state of mind . . . is irrelevant to the existence of probable cause").  "Probable cause exists when the

15

facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present." United States v. Daniel, 809 F.3d 447, 449 (8th Cir. 2016) (citing Florida v. Harris, 568 U.S. 237, 243 (2013)).  Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (quoting United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997)).

### A. The Traffic Stop Was Not Unreasonably Extended

A traffic stop should only last long enough to complete the purpose of the stop.  Rodriguez v. United States, 575 U.S. 348, 354 (2015).  Although the primary purpose of a traffic stop is to "address the traffic violation that warranted the stop," officers may also conduct "incident[al]" inquiries such as running a warrant check on the driver and inspecting the driver's license, registration, and proof of insurance.  Id. at 354–55.  Absent reasonable suspicion that other criminal activity is afoot, an officer's authority for conducting a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. at 354.  But when an officer "discovers information leading to reasonable suspicion of an unrelated crime," he "may extend the stop and broaden the investigation." United State v. Woods, 829 F.3d 675, 679 (8th Cir. 2016).

Cummings does not make any specific assertion that Deputy Landeros unlawfully expand the traffic stop.  Deputy Landeros and Cummings conversation did not unreasonably delay the issuance of the warning ticket.

Cummings had contradictory stories about whose car he was driving; Deputy Landeros requested documentation to confirm whose vehicle it was. Cummings provided Deputy Landeros with car insurance. Deputy Landeros was looking at Cummings' car insurance when Corporal Kaley arrived[6] and began his search of the vehicle. FTR 10:32 a.m.

Given the time required to issue the warning, along with conversation confirming Cummings's story, Deputy Landeros did not lengthen the stop beyond what was reasonably necessary. Even if Deputy Landeros did extend the stop, Cummings' behavior provided Deputy Landeros with reasonable suspicion to do so.

Reasonable suspicion, as already discussed, requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop. United States v. Callison, 2 F.4th 1128, 1132 (8th Cir. 2021). Among other things, indirect answers to officer questions, nervousness, lack of eye contact, and inconsistencies "in response to an officer's routine questions about travel plans" are factors that support reasonable suspicion to expand a traffic stop. Id.

Deputy Landeros had particularized facts that justified continuing the stop to investigate further. Deputy Landeros testified that Cummings gave conflicting stories about whose vehicle he was driving, appeared to be quite

---

[6] Prior to Deputy Landeros observing the traffic violation, Deputy Landeros contacted Corporal Kaley to inform him that he was watching a vehicle and requested that Corporal Kaley start heading north in case he was able to stop the vehicle. Id. at 10:24 a.m.

nervous, and was repeating what appeared to be a rehearsed story. These facts generated reasonable suspicion to extend the stop. Considering this evidence in conjunction with the facts set forth in Section I.A., inits totality, the traffic stop was not unreasonably extended.

**B. Probable Cause Existed to Search**

A dog's alert to the scent of drugs may provide probable cause to search an automobile without a warrant. Harris, 568 U.S. at 243. If the prosecutor "has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." Id. "If, in contrast, the defendant has challenged the . . . case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence." Id. "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Id. "A sniff is up to snuff when it meets that test." Id.

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." United States v. Perez, 29 F.4th 975, 986 (8th Cir. 2022) (quoting Harris, 568 U.S. at 246–47). "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the

18

inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." Id. (quoting United States v. Gonzalez, 781 F.3d 422, 429 (8th Cir. 2015)).

Here, an evidentiary hearing was held, at which evidence was presented regarding Lukin's alert. The United States introduced evidence of Lukin's training and his proficiency in finding drugs. Corporal Kaley testified[7] that he has been a canine handler for five years and Lukin has been with him that entire time. FTR 10:53 a.m. Corporal Kaley testified that Lukin undergoes annual recertification and Lukin has been successful every time. Id. at 10:54 a.m. Corporal Kaley also testified that he and Lukin train a minimum of 20 hours every month, which include training on both patrol and narcotics. Id. at 10:55 a.m. Lukin and Corporal Kaley have also attended tracking schools, trainings with the SWAT team, and other similar trainings when they become available. Id. at 10:55 a.m.

Corporal Kaley testified that Lukin's monthly certification includes training with distractions, including common cutting agents, packaging materials, and clean materials in order to proof them off. Id. at 11:07 a.m. Corporal Kaley explained that "proof them off" means to "prove they are detecting the narcotics and not the packaging agents or marked with a marker or something like that. It's a proof that they're not indicating to the other odors." Id. Lukin has also trained with physical distractions, including people walking around, the presence of food, and searching areas that other dogs have

---

[7] The court finds Corporal Kaley's testimony to be credible.

been.  Id. at 11:08 a.m.  During training, Lukin is rewarded on a variable

reward system; he is rewarded for failing to locate if the room is "clean" as well

as locating if there are narcotics in the room.  Id. at 11:06 a.m.

To the extent Cummings argues Lukin was unreliable or his particular

alert was, the evidence indicates otherwise.  Cummings conclusory assertion

that Lukin is unreliable without providing evidence of such.  On cross

examination, Corporal Kaley was asked if he believed that the command "find

dope" would have the possibility of prompting Lukin to alert.  Id. at 11:05 a.m.

Corporal Kaley stated that "find dope" was "just a command.  Words do not

mean anything to him.  'Dope' does not mean anything to him, the other

command used was 'Zukin' which sounded almost exactly like his name and

[he] did not want to use something that sounded like his name."  Id.

Cummings' counsel asked Corporal Kaley as to his knowledge of the case

Idaho v. Dorff.[8]  Corporal Kaley was asked his understanding of the case;

Corporal Kaley responded, "[i]n that case, the Idaho Supreme Court ruled that

the canine touching the vehicle constituted a search prior to an alert."

Corporal Kaley was asked who trained Lukin to open the car door with his

---

[8] State v. Dorff, 526 P.3d 988 (2023), petition for cert. filed June 21, 2023
(finding a warrantless Fourth Amendment "search" occurred when a police
drug-sniffing dog trespassed on exterior of vehicle when it jumped onto the
car's door for mere seconds; but see Id. at 1001 (dissent) (relying on other
cases and concluding that "[drug dog]'s contact with the vehicle's exterior here
was likewise a minimal and incidental contact to generally sniff the exterior
area around the vehicle," and finding inquiry should turn on the
reasonableness of the governmental intrusion).

mouth, as was done in this case.  Corporal Kaley responded that "no one" trained him to do that; "he is an aggressive indicator and one of his indications is biting and door handles are the only things outside of a car to bite so if they're unlocked sometimes he has opened them."  Corporal Kaley acknowledged that, "according to the Dorff case, once Lukin puled the door open, that was no longer an open-air sniff;" however that action "was post alert" meaning they "already had . . . probable cause to search the car."  The court agrees with Corporal Kaley's analysis.  Any claim that Lukin conducted a search before a probable cause alert was established is rejected.

"[A]ll the facts surrounding [Lukin's] alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  Id.  Lukin alerted to the presence of narcotics by snapping his head back and breathing with his mouth closed.  Id. at 11:01 & 11:11 a.m.  Neither Corporal Kaley's credentials (5 years' experience as a K-9 handler) nor Lukin's credentials (5 years' experience as a drug dog; completion of trainings) are challenged.  Lukin's reliability was not undermined in a way that his alert here would not provide the probable cause to justify the search of the Suburban.

Because credible testimony established Lukin's reliability in detecting drugs and Cummings failed to undermine that showing, Lukin's alert is found to have created probable cause to search the Suburban.  Therefore, the search was conducted with sufficient probable cause, and Cummings' claim to the contrary should be denied.

## **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 38) be denied.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 7th of December, 2023.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

22